TOGUT, SEGAL & SEGAL LLP
Attorneys for Albert Togut, Esq.,
Chapter 7 Trustee
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
          In the Matter                      :    Chapter 7 Case
                                             :    No. 07-13532 [REG]
              -of-                           :
                                             :
          PLVTZ, INC.,                       :
                                             :
                                Debtor.      :
                                             :
-------------------------------------------------------------- X

**TRUSTEE'S INTERIM REPORT OF ADMINISTRATION**

**TO THE HONORABLE ROBERT E. GERBER,**
**UNITED STATES BANKRUPTCY JUDGE:**

        ALBERT TOGUT, the Chapter 7 Trustee (the "Trustee") of the estate of PLVTZ, Inc. (the "Debtor"), respectfully submits to the Court and to the United States Trustee his Interim Report in accordance with 11 U.S.C. § 704:

**PRELIMINARY STATEMENT**

        1.    To date, I have made recoveries of more than $1.1 million. Receipts and disbursements of this estate total $1,130,730.90 and $101,011.67, respectively, leaving a balance on hand of $1,029,719.23.

        2.    Although substantial services have been provided and the administration of this estate has advanced substantially, this estate is not yet ready to be closed. Additional recoveries are being pursued and objections to claims continue to be

prosecuted. Consequently, I will have to render additional services before this case can be closed.

## BACKGROUND

3. On November 8, 2007 (the "Petition Date"), the Debtor commenced a case under Chapter 11 of the Bankruptcy Code in this Court. The Debtor continued to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. Prior to the Petition Date, the Debtor operated its business as Levitz Furniture, a leading specialty retailer of furniture, bedding and home furnishings in the United States with 76 store locations in major metropolitan areas, principally in the Northeast and on the West Coast of the United States.

5. On the Petition Date, substantially all of the Debtor's pre-Filing Date assets were subject to liens asserted by pre-petition senior lenders (the "Senior Lenders") and YA Global Investments, L.P. ("YA Global"), the Debtor's subordinated debenture holder. Although the Debtor attempted to continue its operations, it quickly became apparent that the Debtor had little chance of a successful Chapter 11 restructuring and that its assets would have to be sold.

6. On December 4, 2007, the Bankruptcy Court entered its "Order Pursuant to Sections 363, 365 and 554 of the Bankruptcy Code (A) Authorizing and Approving the Conduct of Going Out of Business, Store Closing, or Similar Themed Sales, With Such Sales to be Free and Clear of All Liens, Claims and Encumbrances, (B) Approving an Agreement for the Sale of Certain Assets, the Conduct of the Subject Store Closing Sales and the Sale of Designation Rights With Respect to Certain Real Property Leases, and Appointing Debtor's Exclusive Agent Therefor, (C) Approving Procedures for Abandonment of Certain Assets, (D) Approving Certain Procedures to

Implement the Subject Designation Rights, Including Procedures for the Assumption, Assumption and Assignment, Rejection or Termination of the Subject Real Property Leases, and (E) Granting Other and Further Relief" (the "Sale Order").

7. Thereafter, on March 18, 2008, the Court entered the "Amended And Restated Stipulation And Final Order Authorizing Nunc Pro Tunc Use Of Cash Collateral And Granting Adequate Protection And Other Relief" (the "Amended Cash Collateral Order").

8. During the course of its Chapter 11 case, the Debtor filed operating reports with the Court (the "Operating Reports") which disclosed, among other things, the total value of the Debtor's assets and liabilities. According to the Debtor's July 2008 Operating Report, a substantial number of creditors were entitled to seek allowance of a Chapter 11 administrative expense claim pursuant to section 503 of the Bankruptcy Code (the "Chapter 11 Administrative Claims").

9. The United States Trustee moved to convert the Debtor's Chapter 11 case to a Chapter 7 case. In support of the motion, the United States Trustee noted that the "Debtor's Operating Reports demonstrated that, at best, the Debtor had a razor-thin margin of administrative solvency," and that the Debtor was not in a position to make a meaningful distribution to non-administrative creditors (Docket No. 816). Pursuant to an Order of the Court dated October 27, 2008 (the "Conversion Date"), the Debtor's case was converted to a Chapter 7 case.

10. On the Conversion Date, I was appointed Chapter 7 interim trustee of the Debtor. I accepted my appointment, duly qualified, and am acting as Trustee.

11. On November 12, 2008, this Court entered an Order authorizing the retention of Togut, Segal & Segal, LLP (the "Togut Firm") as my attorneys, effective as of the Conversion Date.

3

12.    Pursuant to an Order of the Court dated November 21, 2008, I was authorized to retain Bridge Associates LLC ("Bridge") as financial advisors and forensic accountants.

13.    There still remained assets to collect (after the sale of substantially all of the Debtor's assets during the Chapter 11 case), many of which were not identified in the Debtor's Schedules or in the Amended Cash Collateral Order (defined below), and other matters that had to be administered by the Trustee.

## LIMITED OPERATION ORDER

14.    Prior to the Conversion Date, the Debtor operated its business with the assistance of hundreds of employees and contractors. In contemplation of the conversion of the Debtor's Chapter 11 case to Chapter 7 liquidation, the Debtor reduced its workforce to six essential employees who were paid on a part-time basis (the "Employees"). I determined that the Employees had unique knowledge concerning the Debtor's financial affairs and the existence of certain assets that might be recoverable for the benefit of this estate. Consequently, I obtained an Order to authorize me to operate the Debtor's business pursuant to Bankruptcy Code section 721.

15.    The focus of the Employees was to maintain and preserve voluminous documents and information contained in the Debtor's books and records and computer databases. The services provided by the Employees' efforts immediately prior to the Conversion Date and immediately thereafter provided a significant benefit to the Debtor's Chapter 7 estate and to the efforts to preserve documents and information that had been and would continue to be necessary for the administration of this estate.

16. I concluded that the services of the Employees would be necessary as I continued to attempt to identify, marshal and liquidate property of this estate, about which certain of the Employees had unique knowledge and experience.

17. The Conversion Date occurred before the final payroll (the two weeks of services prior to the Conversion Date) that was earned by the Employees. Consequently, those wages, which totaled approximately $15,000, plus associated taxes, had not been paid to the Employees. I deemed it prudent to pay the wages from the Chapter 7 estate to preserve the estate's ability to obtain future assistance from the Employees and the enhanced value to the estate that they were able to efficiently provide. But for the timing of the case conversion, those wages would have been paid.

18. On December 19, 2008, I obtained an order of the Court (the "Operation Order") pursuant to Bankruptcy Code sections 105, 704 and 721 authorizing me to operate the Debtor's business for the limited purpose of winding down the Debtor's financial affairs using the benefits and services provided by the Employees, and to pay hourly sums to Employees, including within the two weeks prior to the Conversion Date, as compensation for services that I would seek from them.

19. Payment of the pre-Conversion Date wages and the authority to pay future compensation to the Employees was an incentive to the Employees to assist me when needed. The cost and expense of duplicating the Employees' efforts would have been far in excess of the administrative cost to retain the benefits that the Employees would provide.

20. As of the date hereof, I have paid the Employees $29,492.42[1] for their post-Conversion Date assistance to the Trustee:

---

[1] Pursuant to the Operation Order, the Employees are responsible for any and all taxes associated with those wages.

- Robert Webber:      $13,688.90
- Robert Giorlando:   $ 6,628.45
- Evalynne Ross:      $ 7,541.66
- Robert Gill:        $ 1,633.41

21.   The services that these Employees have provided have assisted me in connection with: the preservation and marshalling of documents necessary for the administration of this estate; the collection of more than $1 million; the resolution of adversary proceedings; the reduction of Chapter 11 administrative claims by more than $7 million; and the continued pursuit of additional recoveries.

### RECOVERIES BY THE CHAPTER 7 TRUSTEE

22.   As of the date hereof, I have identified, marshaled and liquidated property of this estate which was not administered prior to the Conversion Date. A Form 2 Schedule of Receipts and Disbursements of this estate is annexed hereto as Exhibit "1." The most significant recoveries that I have made include:

(i)   $285,505.98 from General Electric Capital Corporation ("GECC"), which represented cash that collateralized expired letters of credit that were issued by GECC on behalf of the Debtor;

(ii)  $284,483 from Travelers, Inc. ("Travelers"), which represented excess cash deposits that were delivered by the Debtor to Travelers as security for the Debtor's reimbursement obligations under various utility bonds that were posted by Travelers;

(iii) $241,345.78, which represented unearned insurance premiums that held by BWD Group LLC after the Debtor terminated certain insurance policies; and

(iv)  The recovery of funds held in the Debtor's various bank accounts totaling $205,239.24.

### ADDITIONAL ASSETS BEING PURSUED BY THE TRUSTEE

23.   I am pursuing additional recoveries for this estate.

### A. Actions Against Former Sales Representatives

24. Prior to the Conversion Date, the Debtor commenced three adversary proceedings against three of its former sales representatives (the "Sales Representatives") on account of alleged excess commission payments by the Debtor to those Sales Representatives.

25. Agreements to settle with two of the Sales Representatives, for payments totaling $18,000, have recently been reached and will be presented to the Court. Discovery and settlement negotiations with the third Sales Representative continues.

### B. Potential Workers' Compensation Deposit Refund

26. Prior to the Filing Date, the Debtor was required to maintain various workers' compensation insurance policies (the "WC Policies"). In connection with the WC Policies, the Debtor was required to obtain various letters of credit to secure its workers' compensation payment obligations. Travelers issued letters of credit totaling approximately $4 million to secure the Debtor's workers' compensation obligations (the "WC Letters of Credit").

27. Shortly after the Conversion Date, I met with certain of the Employees concerning the WC Letters of Credit, and learned that the Debtor delivered cash deposits of approximately $4 million to Travelers (the "WC Deposit") to protect Travelers against losses arising from draws against the WC Letters of Credit. According to the Employees, the amount of the WC Deposit could exceed claims against the WC Letters of Credit by approximately $1 million.

28. The Togut Firm has been conducting informal discovery and negotiations with Travelers concerning the potential excess amounts of the WC Deposit. That informal discovery has included, without limitation, exchange of claims analyses,

7

reports, and preliminary negotiations. Discovery and analysis concerning the WC Deposit continues.

### C.     Potential Sales Tax Refund

29.    Prior to the Filing Date, the Debtor was a party to an Amended and Restated Merchant Agreement with HSBC Bank Nevada, N.A., f/k/a Household Bank (SB), N.A. ("HSBC") for a private label revolving credit card program for sales to customers.

30.    Prior to the Conversion Date, on May 8, 2008, the Court "So Ordered" a stipulation (the "HSBC Stipulation") between the Debtor and HSBC pursuant to which, among other things, HSBC agreed to pursue sales tax refunds (the "Sales Tax Refunds"), if any, and to prepare tax returns for Sales Tax Refunds for submission to applicable taxing authorities. Pursuant to the HSBC Stipulation, the Debtor is entitled to 40% of any Sales Tax Refunds that are recovered.

31.    My attorneys and I have continued to monitor the efforts of HSBC concerning potential Sales Tax Refunds. Recently HSBC has advised me that a Sales Tax Refund of nearly $1 million may be recoverable, of which this estate may be entitled to approximately $400,000. My retained professionals and I continue to work with HSBC, with input from the Employees, concerning this potential Sales Tax Refund.

### PREFERENTIAL TRANSFERS

32.    Pursuant to the Amended Cash Collateral Order, causes of actions pursuant to section 547 of the Bankruptcy Code (the "Preferences") were sold and conveyed to the GUC Trust that was established under the Amended Cash Collateral Order. The GUC Trustee identified certain Preferences which should be pursued by the

Chapter 7 Trustee for the benefit of the holders of general unsecured claims. The Togut Firm commenced 152 adversary proceedings to attempt to avoid and recover the Preferences, and that work will continue into 2010.

## OBJECTIONS TO CLAIMS

33. The Debtor filed its schedule of unpaid Chapter 11 administrative expenses on December 16, 2008. Subsequently, the Clerk of the Court fixed March 19, 2009 as the last date for the filing of Chapter 11 administrative expense claims.

34. As of the date hereof, 108 Chapter 11 administrative expense claims have been filed in the Debtor's case, totaling approximately $18 million.

35. Those administrative expense claims have been examined and my attorneys and I objected to 27 of them, resulting in a reduction of those claims by nearly $7.4 million.

36. Additional Chapter 11 administrative expense claims are being reviewed and additional objections will be asserted, where appropriate

## CONCLUSION

37. Substantial efforts have been made to administer this estate, and significant assets have been recovered. Moreover, Chapter 11 administrative claims have been reduced by more than $7.4 million.

38. Although substantial administration has occurred, additional recoveries are being pursued, and claim objections are being continued. Consequently,

this estate will not be ready to be closed until next year.[2]

DATED:    New York, New York
         December 15, 2009

                                        /s/ Albert Togut
                                        ALBERT TOGUT
                                        Chapter 7 Trustee of the Estate of PLVTZ, Inc.,
                                        One Penn Plaza - Suite 3335
                                        New York, New York 10119
                                        (212) 594-5000

---

[2] The Trustee does not seek interim compensation at this time, but he expressly reserves the right to do so in the future.

10